## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| Ricardo Lopez, Jr. and<br>Maria Lopez, | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Action No. 4:23-cv-911 |
| | § | |
| American Honda Motor Co., Inc., and<br>Honda Motor Company, Ltd., | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' COMPLAINT

**To the Honorable Judge of Said Court:**

COME NOW, Ricardo Lopez, Jr. and Maria Lopez (hereinafter referred to as "Plaintiffs"), and respectfully file this Complaint against American Honda Motor Co., Inc. and Honda Motor Company, Ltd. (hereinafter referred to collectively as "Honda"), and in support hereof would state and show the following:

### I. Parties

1.    Plaintiffs Ricardo Lopez, Jr. and Maria Lopez are married. They are the surviving biological parents of R.L. III, a deceased minor. They reside in Needville, Texas.

2.    Defendant, American Honda Motor Co., Inc.is a foreign corporation who does not maintain a registered agent for service of process in the State of Texas. In

accordance with Tex. Civ. Prac. & Rem Code **§** 17.044, service may be effectuated by substituted service on the Texas Secretary of State, Statutory Documents Section – Citations Unit located at P.O. Box 12079, Austin, Texas 78711-2079. American Honda Motor Company, Inc. may be served by serving any of its officers at its principal place of business located at 1919 Torrance Blvd., Torrance, California 90501.

3.    Defendant, Honda Motor Company, Ltd., is a Japanese corporation doing business in Texas, and service of process upon this Defendant may be had by serving its President at his business address, Nobuhiko Kawamoto, 2-1-1 Minamiaoyama, Minato-JKu, Tokyo, 107-0062, Japan, and the parent company of American Honda Motor Company, Inc. Service of process may be effectuated through the Hague Convention, 20 U.S.T. 361; 658 U.N.T.S. 163. Defendants American Honda Motor Company, Inc. and Honda Motor Co., Ltd. are collectively referred to herein as "Honda".

## II. Jurisdiction

4.    This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

5.    The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.    Honda's products include cars and motor vehicles, automobile engines, transmissions, and press parts. These products are distributed throughout North America, including the United States, and including Texas.

7.  For years up until the present date, Honda has been aware/is aware that thousands upon thousands of its vehicles and other products were (and are) arriving in Texas through the stream of commerce and being sold in Texas.

8.  Indeed, for years, Honda was (and is) aware that thousands upon thousands of its vehicles and other products were (and are) arriving in Texas through other states.

9.  Furthermore, Honda is aware that it has end users of its vehicles and other products located in Texas.

10.  Honda, if it wanted to, could choose to refuse to ship vehicles and other products to Texas. However, Honda, has never, in any way, shape, or form, restricted the Subject Vehicle model which caused the injuries complained of herein from being distributed, sold, or used in Texas, nor has Honda, ever, in any way, shape, or form, restricted any of its vehicles or products that it designs, manufactures, or distributes from being distributed, sold, or used in Texas.

11.  Thus, it is clear that Honda's vehicles and other products arrive in Texas either through direct shipment or through the stream of commerce and that Honda is aware of this fact.

12.  Honda also knows that there are consumers who are looking for Honda vehicles and other products in Texas, and Honda helps them buy vehicles and other products in Texas by providing them with information about their vehicles and products.

13.    Honda spends at least hundreds of thousands, if not millions, of dollars per year marketing its products, including the Subject Vehicle. Indeed, for many years up until the present, Honda has made, approved, and/or distributed advertisements or commercials or other marketing materials touting the safety of Honda vehicles and how much Honda supposedly cares about safety.

14.    Advertisements and marketing materials were and are targeted to United States consumers, including Texas residents, to entice them to purchase Honda vehicles, including the model of the Subject Vehicle.

15.    Honda made, approved, and/or distributed these types of materials to entice consumers and ultimate users, including those in Texas, to (1) purchase Honda vehicles—whether used or new; (2) to drive Honda vehicles—whether used or new; and (3) to ride in Honda vehicles—whether used or new.

16.    Honda knew that American consumers—including consumers in Texas— would rely upon its statements when deciding whether to purchase a Honda vehicle, whether to drive a Honda vehicle, or whether to ride in a Honda vehicle.

17.    On the Subject Vehicle, Honda affixed a sticker wherein Honda affirmatively represented to consumers that, "This vehicle conforms to all applicable federal motor vehicle safety and theft prevention standards in effect on the date of manufacture."

18.    Based upon information and/or belief, the Subject Vehicle did not meet all Federal Motor Vehicle Safety Standards (FMVSS).

19.   Honda is currently in exclusive possession and control of all the technical materials and other documents/material regarding the design, development, manufacture, assembly, engineering analysis, and testing of the Subject Vehicle

20.   Based upon information and/or belief obtained from those other cases, employees, officers and/or directors of Honda have visited, lived, conducted business, and/or worked in Texas.

21.   Based upon information and/or belief obtained from those other cases, Honda also monitors its vehicles, such as looking at customer complaints or feedback from distributors and dealers, including many in Texas.

22.   Honda holds patents and trademarks which it demands must be honored in Texas.

23.   Honda provides a warranty for certain Honda vehicles, including vehicles in Texas.

24.   Honda routinely corresponds and works with the National Highway Traffic Safety Administration (NHTSA) on recalls and other issues, including recalls or fixes to problems for vehicles owned and used by Texas residents.

25.   Honda has appeared in other litigation—including product liability litigation involving its vehicles—in Texas and not contested personal jurisdiction, both in Texas state court and federal court.

26.   Honda designs, manufactures, tests, assembles, sells, distributes, and places Honda model vehicles and their component parts into the stream of commerce, such as the Subject Vehicle involved in the incident made the basis of this suit.

27.  Honda placed the Subject Vehicle into the stream of commerce where it ultimately ended up in Texas.

28.  Honda knew that once it placed the vehicle into the stream of commerce, that there was a likelihood the car would wind up in Texas and/or be driven on Texas roads where it might be involved in an accident.

29.  The key elements of the episode-in-suit occurred in Texas.

30.  Honda has purposefully availed itself in Texas, and due process and fair play and substantial justice are honored by this civil action going forward in this Texas Court.

31.   There is little or no burden on Honda litigating this case in this Texas Court. In contrast, it would be a tremendous burden and great inefficiency and unnecessary delay imposed on the Plaintiffs to litigate this case in another forum because Texas has an interest in overseeing this litigation which involves injuries to the Texas resident and defective products used in Texas.

32.  The efficient resolution of this civil action can only go forward in this Texas Court, and public policy favors resolution of this dispute in this Texas Court.

33.  Honda cannot deny personal jurisdiction because Honda placed the Subject Vehicle into the stream of commerce under circumstances such that Honda should reasonably anticipate being haled into court in Texas, where it has been many times before.

34.  Honda cannot deny personal jurisdiction because Honda placed the Subject Vehicle into the stream of commerce knowing full well that the Subject Vehicle—as

well as hundreds if not thousands of other vehicles of the exact same model—could very well ultimately wind up in Texas and be driven by Texas residents on Texas roads, and that said vehicle(s) might be involved in an accident in Texas which might injure occupants of the vehicle.

35.   In short, Honda is in the business of the manufacture of vehicles, including the vehicle which caused the damages complained of herein. Honda also derives substantial profit from the state of Texas.

36.   Honda, in no way, shape, or form ever restricted the Subject Vehicle, which caused the serious injuries, from being distributed, sold, or used in Texas. Honda has purposefully availed itself of the privilege and benefits of conducting activities within Texas.

37.   Accordingly, Honda is therefore subject to be sued in Texas courts, and the exercise of personal jurisdiction pursuant to Texas's long arm statute is, among other things, consistent with due process because Honda has purposefully availed itself of the privilege of doing business in the forum.

### III. Facts

38.   On or about October 26, 2022, Decedent R.L. III, a minor, was driving a 2020 Honda Accord (VIN: 1HGCV1F3LA132862) ("Subject Vehicle").

39.   The Subject Vehicle was traveling southbound on Highway 36 when for unknown reasons control of the Subject Vehicle was lost causing it to enter the northbound lanes and ultimately striking another vehicle.

40.   The Subject Vehicle was designed   by the Honda Defendants.

41.   The Subject Vehicle was manufactured by the Honda Defendants.

42.   The Subject Vehicle was marketed by the Honda Defendants.

43.   The Subject Vehicle was also assembled by the Honda Defendants.

44.   Despite being properly seated and properly wearing the available seat belt, Decedent R.L. III, a minor, sustained fatal injuries when the Subject Vehicle failed to protect him because it violated several crashworthiness principles.

## IV. Crashworthiness Overview

45.   Crashworthiness is the science of preventing or minimizing injuries or death following an accident through the use of a vehicle's various safety systems.[1]

46.   There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    1.   Maintain survival space;

    2.   Provide proper restraint throughout the entire accident;

    3.   Prevent ejection;

    4.   Distribute and channel energy; and

    5.   Prevent post-crash fires.

---

[1] In any crashworthiness case, the distinction between the cause of an accident versus the cause of injuries is an important one. One of the best analogies is the case of the Titanic. While the cause of hitting the iceberg has been the subject of much debate (inattentiveness, the captain may have been drinking, they were going too fast, etc.), there is no question that every passenger which entered a lifeboat that night lived, while 99% of those who went in the water died. Accordingly, had the Titanic had enough lifeboats on board (i.e., the boat's "safety systems"), 100% of the people on-board would probably have lived. So, the cause of the sinking (the accident) is irrelevant vis-à-vis how everyone died. What's important is how the safety systems worked (or didn't work) following the accident.

47.    When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

48.    The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

49.    Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

50.    Automotive manufacturers have known for decades that there is a distinction between the cause of an accident versus the cause of an injury. For instance, General Motors has admitted this under oath. General Motors has even stated that it is irrelevant who caused an accident, and that safety systems have to perform properly no matter who or what causes an accident.

## V. Duty to Make a Safe Vehicle

51.   It is incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing and reverse engineering of all other manufacturers' vehicles.

52.   Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health and welfare of the public." Accordingly, since "paramount" means "superior to all others," all vehicle engineers have to hold the safety, health and welfare of the public as their highest considerations when they design vehicles.

53.   Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

54.   Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she stated: "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

55.   Further, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues.

The report stated, "NHTSA also lacked the focus and rigor expected of a federal safety regulator." Further, NHTSA acknowledged its staff has a "lack of knowledge and awareness regarding the evolution of the vehicle safety systems they regulate."

56.    Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When the manufacturer knows – or, through reasonable diligence, should know – that a product design presents a latent hazard or foreseeable risk of injury, the manufacturer must go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

57.    For decades, automobile manufacturers have been telling the general public and others how important it is to make safe vehicles.

58.    For instance, in 1993, General Motors stated, "Safety isn't one thing, it's everything." Testifying to Congress in 2014, Mary Barra, CEO of General Motors, testified, "Our customers and their safety are at the center of everything we do." Jeff Boyer, Vice-President of Global Vehicle Safety at General Motors, has stated, "Nothing is more important than the safety of our customers in the vehicles they drive."

59.    General Motors has also stated: "The rich don't deserve to be safe. . . . Isn't it time we realized safety is not jut for the pampered and the privileged? Safety is for all."

60.    Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

Gerald Greenwald, chairman of Chrysler, then sent a letter to every Chrysler dealership in 1988 stating that Chrysler intended to honor that right.

61.    In 2012, Volvo stated , "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

62.    BMW has stated that BMW vehicles are designed to minimize the effects of accidents. BMW has also stated that the cornerstone of BMW's design philosophy is "Safety – during and after an accident."

63.    In 1991, Toyota said that "Toyota engineers are faced with making all vehicles as safe as humanly possible."



64.    For over 80 years, Ford has been touting to the public how much it cares about safety. Indeed, in 1934, Ford stated: "Safety is the most desirable of all the qualifications that the car of today must have."

65.    Since that time, Ford has been representing to the public how its cars are safe and how consumers should trust Ford when it comes to safety.

66.   In fact, Ford has also admitted that it has a "moral obligation" to reduce the risk of injury to consumers:



67.   Mazda has stated that when it comes to safety, you can never go too far, promising, "since drivers are human beings and human beings are fallible, Mazda offers a range of technologies which help to prevent or reduce the damage resulting from an accident."

68.   Below is an advertisement from Mazda wherein Mazda makes the comment that they have made every side of their vehicles safe:



69.   In 2002, Mitsubishi stated: "Your safety, and the safety of your passengers, has always been a primary concern of Mitsubishi engineers."

70.   Kia, which is owned by Hyundai, has stated that in designing and testing its vehicles, there's nothing Kia considers more important than safety.

71.   Kia has stated that it strives to achieve crashworthiness results that far exceed those required by law.

72.   Kia has said that no one can predict a collision occurring, but you can trust a Kia vehicle to protect you should the unforeseen happen.

73.   Kia has further stated that Kia works tirelessly to ensure that every safety system on its vehicles is designed to help people handle the unexpected.

74.   Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are

basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regard to safety and to apply those same methods or technology to their own vehicle.

75.    Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, Korea or some other country and refuse or fail to offer that same safety technology to consumers in America.

76.    It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades of vehicle design, testing and reverse engineering of other manufacturers' vehicles.

77.    In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicles they manufacture and sell will not be harmful to buyers, their households or third parties.

**78.**    This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

## VI. Honda and Safety

79.    Honda has stated that it believes that safety is for everyone, including for other vehicle occupants and pedestrians.



## VII. Cause(s) of Action as to Honda Defendants

### *A. Count One: Strict Liability and Defective Design/Manufacture/Failure to Warn*

80.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

81.   Honda Defendants (referred to in this Section simply as "Defendants") are in the business of designing, manufacturing, testing, assembling, marketing and/or distributing vehicles, including the Subject Vehicle.

82.   Defendants designed, manufactured, tested, assembled, marketed, and/or sold the Subject Vehicle that caused the fatal injuries to Plaintiffs' minor son and Plaintiffs' damages.

83.   The Subject Vehicle was defective and unreasonably dangerous for its intended use.

84.   The Subject Vehicle was defective at the time it left Defendants' control.

85.   Reasonable consumers would not have been aware of the defective condition of the Subject Vehicle.

86.    Plaintiffs were not aware of the defects in the Subject Vehicle.

87.    The fatal injuries to R.L. III, a minor, complained of herein occurred because the Subject Vehicle was defective and unreasonably dangerous.

88.    As detailed herein, the Subject Vehicle contains multiple design defects, Defendants have committed multiple acts of engineering negligence and Defendants have created false, misleading and/or deceptive marketing intended to lure consumers.

89.    The Subject Vehicle was defective and unreasonably dangerous, the Defendants were strictly liable, negligent and Defendants misrepresented the safety of the Subject Vehicle in the following, non-exhaustive list of ways:

   a.    The Subject Vehicle violates principles of crashworthiness;
   b.    The Subject Vehicle was not properly crash tested;
   c.    The Subject Vehicle was not subjected to rigorous engineering analysis to evaluate striking the A-pillar with the head in a small offset impact;
   d.    The Subject Vehicle failed to maintain survival space for the restrained front seated occupant in small offset impacts;
   e.    The Subject Vehicle failed to utilize UHSS, AHSS, EHSS, boron, martensite, ferrite, complex phase, dual phase and TRIP type steel in the front structure;
   f.    The Subject Vehicle failed to utilize UHSS, AHSS, EHSS, boron, martensite, ferrite, complex phase, dual phase, and TRIP type steel in the areas of the vehicle that would maintain survival space in the cabin;
   g.    The Subject Vehicle failed to utilize steel with MPa in excess of 1,100 in the front structure;
   h.    The Subject Vehicle's front airbag shifted inboard;
   i.    The restrained driver struck the A-pillar with his head;
   j.    The Subject Vehicle lacked countermeasures to address small offset frontal impacts;
   k.    The Subject Vehicle had a gap in protection between the side curtain and the frontal airbag;

l.   Defendants bragged that it specializes in building small cars that are just as safe as larger, heavier, and more expensive vehicles;

m.   Defendants bragged, touted and/or marketed its vehicles as being safe, state of the art, engineered to be the best and engineered to protect families;

n.   Defendants tout that safety is one of Honda's foremost concerns;

o.   Defendants tout that safety is always on Honda's mind;

p.   Defendants tout that Honda is fully aware of its responsibility to produce vehicles with the best overall safety possible;

q.   Defendants tout that Honda collects accident data and applies that data to the planning and design of new models to continuously improve automobile safety;

r.   Defendants tout that Honda works hard to stay at the cutting edge of technology;

s.   Defendants tout that computer aided engineering is indispensable to the prototype development process;

t.   Defendants tout that Honda uses CAE to test new design ideas and structures;

u.   Defendants tout that Honda uses finite element method to create models to simulate real testing;

v.   Defendants tout that Honda believes that safety is fundamental in making vehicles;

w.   Defendants tout that Honda believes in Kaizen-- continuous improvement since no process can ever be declared perfect, there is always room for improvement;

x.   Defendants tout that Honda always works to improve by putting forth new ideas and making the best of their abilities;

y.   Defendants tout that Honda believes that everyone deserves to be safe;

z.   Defendants have bragged that Honda was spending one million dollars an hour to enhance technology and consumer safety;

aa.   Defendants have pledged to the American consumer that they will have continual improvement, that they will learn from their mistakes and that they need to do better;

bb.   Defendants tout that no matter who you are and what you drive, everyone deserves to be safe;

cc.   Defendants tout that Honda creates vehicles with your family in mind;

dd. Consumers expect Defendants to use state of the art engineering, materials and design;

ee. Consumers expect Defendants to provide safe vehicles that have been tested and subjected to rigorous engineering analysis;

ff. Defendants violated consumer expectations;

gg. The defects, negligence, deceptive, false and misleading marketing and/or violations of consumer expectations were the direct, producing, substantial and/or proximate cause of the fatal injuries Plaintiffs' minor son and damages to Plaintiffs.

**B. Count Two: Negligence**

90. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

91. In addition to and/or in the alternative to the product liability claims asserted herein, Defendants were negligent in the design, manufacture, testing, assembly, marketing, and/or distribution of the Subject Vehicle.

92. Companies that are in the business of designing, testing, manufacturing, marketing, distributing and selling products are never allowed to needlessly endanger consumers.

93. Defendants owed a duty to use reasonable care in the design, manufacture, testing, assembly, marketing and/or distribution of the Subject Vehicle.

94. Defendants failed to use reasonable care when they designed, manufactured, tested, assembled, marketed, distributed and/or sold the Subject Vehicle, and consequently put a product on the market that was unreasonably dangerous for its intended or reasonably anticipated use as discussed herein.

95. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards and/or dangers that can lead to serious injury or death.

96. Once potential risks, hazards, and/or dangers identified, then the potential risks, hazards, or dangers should be eliminated if possible.

97. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

98. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

99. A company is negligent where the company fails to conduct a proper engineering analysis that would help it to identify potential risk, hazards, and/or dangers that could seriously injure someone.

100. Accordingly, Defendants had a duty to conduct proper engineering analysis and to conduct proper testing that would help to identify potential risks, hazards, and/or dangers that could seriously injure someone. Defendants breached said duty.

101. With respect to the Subject Vehicle, based upon information and/or belief, the Subject Vehicle was not subjected to rigorous engineering analysis.

102. With respect to the Subject Vehicle, based upon information and/or belief, the Subject Vehicle was not properly tested and analyzed to determine what countermeasures were needed to protect front seated occupants in the type of accident that occurred herein.

103. Based upon information and/or belief, Defendants either knew or should have known about advanced safety features used in Europe, Australia, Japan or foreign markets and chose not to offer those safety features to American consumers.

104. Defendants' safety philosophy and design philosophy are utilized in various model vehicles and parts, including ones sold in foreign markets.

105. When Defendants designed the Subject Vehicle, Defendants did not reinvent the wheel. Defendants used (or should have used) an enormous amount of human capital which had been acquired from numerous different engineers who had worked on many prior vehicles. This knowledge would have been (or should have been) utilized in different aspects of the designs of the vehicle to make the Subject Vehicle safer in foreseeable accidents such as what occurred in this case.

106. Defendants are currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the Subject Vehicle. Defendants are also in possession of what, if any, engineering analysis was performed.

107. However, it is expected that after all these materials are produced in discovery and/or after Defendants' employees and corporate representatives have been deposed, additional allegations may come to light.

108. Lastly, the materials from other models, years, and foreign markets will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

109. The foregoing acts and/or omissions, defects, misrepresentations and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the fatal injuries to R.L. III, a minor and damages to both Plaintiffs.

### C. Count Three: Misrepresentation

110. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

111. Defendants have misrepresented that safety must come first.

112. Defendants has misrepresented that they have an obligation to protect vehicle occupants in the best way possible should the worst-case scenario arise.

113. Specifically, for decades Honda has touted the safety of its vehicles.

114. The Subject Vehicle failed to possess all of the state-of-the-art safety equipment qualities that the Defendants have touted for decades.

115. The foregoing acts and/or omissions, defects, and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the fatal injuries to minor R.L. III and damages to both Plaintiffs.

## VIII. Damages to Plaintiffs

116. As a result of the acts and/or omissions of Defendants, Plaintiffs have suffered past and future: loss of companionship and society, loss of consortium, emotional distress and mental anguish as a result of the death of their minor son.

117. Plaintiffs lost their son's love, affection, advice and relationship that exists between a son and his parents.

118. Plaintiffs seek all statutory and common law elements of damage that are permitted to be recovered in a wrongful death case involving a minor child.

119. The above and foregoing acts and/or omissions of Defendants, resulting in the fatal injuries to R.L. III, a minor, have caused actual damages to Plaintiffs in excess of the minimum jurisdictional limits of this Court.

## IX. Prayer

120. For the reasons presented herein, Plaintiffs pray that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recover judgment against the Defendants for:

a. actual damages;
b. prejudgment and post-judgment interest beginning October 26, 2022;
c. costs of suit; and
d. all other relief, general and special, to which Plaintiffs are entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**

  /s E. Todd Tracy
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
TTracy@vehiclesafetyfirm.com
Garrett D. Rogers
State Bar No. 24110295
Grogers@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas 75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiffs**